## THE EARL P: MASON.

## THE SHAWMUT.

(District Court, E. D. Pennsylvania.   April 25, 1912.)

### Nos. 51, 55.

COLLISION (§ 45*)—STEAM AND SAILING VESSELS—FAULT.

   A collision at sea at night between a schooner and a steamship going
in the same general direction, but on converging courses, *held* due solely
to the fault of the steamship, which was moving at greater speed, prob-
ably in miscalculating the distance between the vessels and keeping· her
course too long; the schooner, as the privileged vessel, properly keeping
her course and speed.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 51; Dec. Dig.
§ 45.*]

In Admiralty.   Suit by the schooner Earl P. Mason against the
steamship Shawmut for collision, and cross-suit.   Decree for the Earl
P. Mason.

Howard M. Long, for the Earl P. Mason.

Francis C. Adler and John F. Lewis, for the Shawmut.

J. B. McPHERSON, District Judge.   These are cross-libels be-
tween the schooner Earl P. Mason and the steamship Shawmut; each
charging the other with being solely at fault for a collision that oc-
-curred at sea about 4 o'clock in the morning of November 6, 1910.
Several facts are not in dispute:   A fresh breeze was blowing from
the northwest, and the night was dark and cloudy, but not foggy, or
even misty, so that lights were easily visible at the usual distance.
Both vessels were on their way down the New Jersey coast.   The
schooner—a wooden, three-masted vessel, 145 feet long, about 35 feet
beam, and 15 feet depth of hold, of 462 tons net register—was sailing
light from New York, expecting to take on cargo at Norfolk.   The
steamship—an iron vessel, 259 feet long, 36 feet beam, about 19 feet
depth of hold, of about 1,100 tons net register—was loaded, and was
bound from Philadelphia to Charleston and Jacksonville.   The schoon-
er was on the starboard tack, as she had been for several hours before
the collision, and both vessels were helped by the tide; the speed of
the schooner being about 6 miles an hour, while the speed of the

---

steamship was about 9 miles. No other vessel was near, and the collision occurred in the open ocean, in the neighborhood of the Fenwick Island lightship. There is, of course, much dispute concerning the cause of the collision, and after reading the 700 printed pages of testimony I find the case to present the usual situation—a hopeless conflict among the witnesses, in which a court can do nothing except adopt the more probable account.

In finding the facts I shall not discuss the testimony, but shall simply give my ultimate conclusions. In my opinion, what happened was this: Both vessels were proceeding in a southerly direction, the schooner in the lead and some distance to the east. Her course had been about S. W. ½ S.; but about 3 o'clock she made a slight change to S. W., and continued in this direction until the collision took place. The steamship's course had been S. S. E. until not long after 3 o'clock, when a change was made to S. E. by S. These were intersecting courses, but whether danger would result from pursuing them depended upon the relative position of the two vessels. No harm could be done as long as the steamship was far enough astern of the schooner; but, as her greater speed lessened the distance between them, the two courses inevitably brought the vessels nearer together and increased the danger of collision. It was, therefore, of the utmost importance that both should be vigilant and should carefully observe the rules of the road on the open sea. No complaint can be successfully made of the schooner in these particulars. She observed the lights of the steamship from the time they first became visible at a distance of at least two miles; and, although she became uneasy as they drew visibly nearer, she was the privileged vessel, and had a right to do as she did, namely, hold her course, in the belief that the steamship would either pass astern or would keep sufficiently to starboard to avoid all danger. The fault lay with the steamship. It is clear, I think, either that her inexperienced lookout—a seaman who had just been shipped after little inquiry into his very slender qualifications, and was performing the duty of a lookout for the first time in his life—failed in vigilance, or (what is perhaps more likely) that she miscalculated the distance between the vessels and got into a fatal position before she fully realized the situation. Her maneuvers lend much color to the belief that she supposed at first she might safely take the risk of keeping her course, even if this involved crossing the schooner's bow. Finding, however, that this was too dangerous, she abandoned the attempt, changed her course more to the east, and tried to do last what she ought to have done first, namely, to cross astern of the schooner. She nearly succeeded in the belated effort, but not quite, for she struck the schooner well aft on the starboard quarter, carrying away the mizzenmast and doing much other damage. The physical facts of the collision support what has just been said. The blow was delivered at an angle from forward aft, the schooner's house being moved aft and toward the port side, and the two vessels immediately afterwards lay starboard to starboard, the steamship's bow alongside the schooner's stern. The schooner did not jibe. It is clear that she was not pushed around the steamship's bow, as if upon a pivot—a nearly incredible theory, not put forward with much confi-

dence, I think—and the steamship in a moment or two slipped away under the schooner's stern.

The steamship offers two alternative and inconsistent defenses. The first is that she was overtaking the schooner from a position more than two points abaft the beam, where she could see no side lights, and that the schooner failed to show a flare, as required by the tenth of the International Rules. I do not believe this defense. The undeniable physical facts of the injury are themselves enough to discredit it, without dwelling upon the other, and I think the more probable, evidence to the contrary. The second defense is that, even if she was where the schooner's testimony places her, she could not see the latter's green light, because it was defective in carrying power. I have read all the testimony on this subject, and have examined the light itself, and I am satisfied that the slight defect in the lantern is greatly exaggerated in the argument. The subject was investigated by the federal authorities immediately after the collision, and, as no evidence has been offered concerning that inquiry, it is not unreasonable to believe that it would not strengthen this defense. But, aside from this, I am satisfied that the light was in condition to be seen at the distance required by the rules, and I have little doubt that it was actually seen, but was disregarded, for the reasons already given. Either this, or the steamship's lookout failed in his duty.

A decree may be entered in favor of the schooner in No. 51, and dismissing the cross-libel in No. 55, with costs to the schooner in both cases. If the parties cannot agree upon the amount of damage, a commissioner will be appointed.